This is the estate of Clark v. Walker. Mr. Boal. Good morning, your honors. The district court erred in this case in not granting Officer Walker qualified immunity consistent with the U.S. Supreme Court's decision in the recent case of Taylor v. Barkas. The Taylor case involves facts that are remarkably similar to the facts in this case, with one exception that I'd like to discuss later. In Taylor, the Supreme Court held there is no clearly established constitutional right to the proper implementation of adequate suicide prevention protocols. Now, the Supreme Court went on to note that its decision was consistent with four circuit courts, the Fourth, the Fifth, the Sixth, and the Eleventh, and those decisions in fact call into question whether there is any constitutional right, whether it's clearly established or not. But looking beyond... Is it your contention that a defendant, that a correctional officer who has actual knowledge of a high risk of suicide has no duty to act on it? That's not clearly established under federal law? That is my contention, but in this particular... Actual knowledge of a high risk for this defendant, for this prisoner, no duty? Your honor, that's a very aggressive position, and we don't have... Is that your position? No, that is not my position. We don't have to go nearly that far in this particular case. In this particular case, if we look beyond qualified immunity, Officer Walker did exactly what he was supposed to do. The district judge found that Officer Walker, sorry I checked, that he got the maximum risk assessment under the Spillman screening, right? That's correct. And the district judge found that he knew then of the risk. That's a factual determination that's really beyond the scope of our jurisdiction. So given that actual knowledge, it seems to me you have to take that quite aggressive position, isn't it? Well, your honor, I believe the court has penned a jurisdiction to address the question of whether the district court should have granted summary judgment. We do that, but we can't address factual questions. Both parties, both sides treated our jurisdiction as unquestioned here, but it's in fact quite limited to legal issues, not to whether the evidence, for example, adequately supported the district judge's factual determinations. Johnson against Jones is a Supreme Court case dealing with that, and we deal with that all the time. So we have to treat actual knowledge of the risk here as a given. Now suppose a correctional official has actual knowledge that a prisoner has a serious infection. Is the duty to respond to that reasonably well established, clearly established under federal law? Yes. Federal law is... Why is suicide different? Your honor, suicide, let me back up. The Supreme Court has made it very clear that there is no clearly established right to the adequate implementation of a suicide prevention protocol. Right. Taylor was not dealing with actual knowledge, however, of a risk. It was dealing with a larger policy about whether jails have a duty to put in place a suicide prevention protocol, but our case law is very well established, at least that where you have actual knowledge of a risk. There is a clearly established duty to respond reasonably, whether or not successfully. Your honor, my position is that this court has pendant jurisdiction to reach the question of whether Officer Walker's response was reasonable, and if you... Okay, let's suppose that's right. How did he respond in a way that was different from the way he would respond to any low-risk inmate or detainee? What he did, which he would not have to do for a regular detainee, is he put Mr. Clark in a holding cell, which was uniquely positioned to prevent suicide attempts. The holding cell was 15 feet away from the booking desk, and the booking desk... I thought that's where everybody was routinely held. That's why it's called a holding cell, right? It's not the suicide prevention cell. Well, your honor, there is general population. Mr. Clark was never sent to general population. He was ultimately sent by the jail nurse to a special needs cell, but Officer Walker put him in a position... Officer Walker did two things that are flawless. Number one, he put him in a cell where he, for all practical purposes, couldn't attempt suicide. Number... That's the cell we know where he did succeed in killing himself? No, absolutely not. Different? No, that is not right. Okay. The sequence of events is this. Officer Walker put Mr. Clark into a holding cell and left the results of the Spillman suicide assessment where it would be found and seen by medical personnel. Those are the assumptions Officer Walker made, and he was right. When in the holding cell, the nurse who testified that she was trained to make a suicide assessment came to assess Mr. Clark in the holding cell, interviewed him, and saw the results of the Spillman test. That ends Officer Walker's involvement in this case. His performance was flawless. He put Mr. Clark in a cell where he couldn't commit suicide, and he left the results where they would be seen and were seen by the nurse. The nurse conducted an evaluation. Mr. Clark said he wasn't suicidal. The nurse found no evidence that he was, concluded that he wasn't, but didn't put him in general population. The nurse put him in one of two special needs cells where prisoners with special needs are housed. Now the nurse testified that she did this because Mr. Clark was intoxicated, and the detoxification process requires some time. The cell assignment was made by the nurse, and the nurse made a perfectly reasonable cell assignment to a special needs cell. Now one additional foundational fact that I think sets this case apart from Taylor and sets this case apart from this circuit's decisions in similar cases, the Calvary case, the Hall case, and the Sanibel case, is that the suicide occurred five days later. The nurse assigned Mr. Clark to go to the special needs cell, and in the next five days there is no evidence that Mr. Clark evidenced any sign of suicidality. Now that's different than the suicide cases that this court has found in the past. Because of that, I believe it is entirely possible that the assessment by the nurse that Mr. Clark was not suicidal may have been entirely accurate. Five days... That also involved the ending, he was off of his antidepressant medication, correct?  I represent Officer Walker. Officer Walker's involvement ended five days before the suicide occurred. The question is whether the prisoner is in imminent risk, immediate risk, of committing suicide. And in all of these cases, including the Taylor case, the Calvary case, the Hall case, the suicide occurred shortly after the evaluation. Do I understand your position correctly, Mr. Boll, that you are at this point defending on the theory that Walker recognized there was a risk and took appropriate steps? Your Honor, yes. But I must add that Mr. Walker testified that he knew Mr. Clark, he liked Mr. Clark, and he didn't think Mr. Clark was suicidal. The Spillman test said he was at maximum risk, so Officer Walker responded appropriately. But Mr. Clark said he wasn't suicidal, and Officer Walker testified that he didn't think he was suicidal, but he was doing the prudent thing to place him in a holding cell, pass the information on to the nurse, just as he would have if he believed... Where did the other suicide attempts take place? The previous suicide attempts, where did they take place? Your Honor, I'm not sure. Not in that... There was no evidence in the record that they occurred in jail. Not in that... At least not in that jail. Absolutely. Absolutely. I believe my time is up, but I'd like to address any additional questions you might have. Not at this time. Thank you. Mr. Elmer, thank you, Mr. Bowman. Good morning. May it please the Court, my name is Steve Elmer, and I represent Nurse Tina Keene. I would like to talk about two issues today. The first is that this Court should reverse the District Court's grant of summary judgment because under this Court's precedent, there is no way that Nurse Keene could have been aware that Mr. Clark was a significant risk of committing suicide in the short term. Second, she's entitled to invoke the immunity defense also. On the first question, I guess you're talking about knowledge of the risk, right? Yes. The District Judge found to the contrary, that at least there were questions of fact as to whether she had actual knowledge. She saw the spillment result, right? That's correct, Judge. She put it in his chart. It says maximum risk. How do we even have jurisdiction to review that assessment? Well, I think that the District Court didn't discuss really in any detail whether or not the nurse had knowledge that Mr. Clark was at an imminent risk of suicide. The District Court... The screening says maximum risk. What follow-up did she do? Well, first of all, Your Honor, Officer Walker testified in his deposition that any person who was intoxicated would automatically trigger a maximum risk, and there's... You saw the rest of that deposition passage, right? Where he doesn't know what he's talking about, about suppose he's sober, how that risk assessment works out, right? He doesn't know. He didn't do it, and nobody did a follow-up, did they? A follow-up? After he was sober. No. No, that's correct. So you get a maximum risk assessment, right? Yes. Don't you have to treat him as maximum risk at that point? Well, I think in part, as Mr. Bohl mentioned, the nurse assessed Mr. Clark, noted that he was at risk of going through alcohol withdrawal, and placed him in a special needs cell. That cell was monitored by video camera by an officer around the clock. So Mr. Clark was placed on around-the-clock video assessments. Is that the cell in which he committed suicide? Yes. It's not the suicide prevention cell? That's correct. Was the suicide prevention cell occupied? I don't believe that it was, Judge. The law in the circuit, as Mr. Bohl touched on briefly, is that the defendant must have knowledge that the inmate is at a significant likelihood to imminently seek to take his own life. There are basically two categories of two kinds of ways where a defendant could have that knowledge. The first is where the inmate says something that gives a warning that he might be suicidal. For example, I don't want to live like this anymore, or simply answering a question in the affirmative, are you planning on committing suicide? The other way is behavioral cues that may alert a defendant that the inmate is at risk of suicide, such as recent past suicide attempts, unexplained injuries, that sort of thing. Neither of those are present in this case. Mr. Clark had risk factors alone. When did the prior suicide attempts surface? You mean when they occurred, Your Honor? No, no. When did the nurse and or the guard find out about it? There's no evidence in the record that they knew about the prior suicide attempts before the litigation. Was that after the litigation that that came about? Yes. Mr. Clark, in the suicide risk assessment, reported that he had attempted to commit suicide, I think it was nine years in the past. There's really no detail other than that that we have. There are some records in his voluminous jail chart that he may have attempted to commit suicide at a different facility, and that that was, I think, a year and a half or so before his successful suicide attempt. So those are the other two. But none of that information was available simultaneously at the time he was in the jail? Well, the suicide attempt approximately one and a half years prior was in Mr. Clark's voluminous jail records, but there is no indication that either the nurse or Officer Walker reviewed all those jail records before they treated Mr. Clark. Wouldn't that be sort of normal follow-up, given a maximum risk assessment, somebody on antidepressants who can't provide the identity of the drug or the doctor, no follow-up at all, said the district judge? Well, the nurse testified that she was planning on following up after she returned the next week. Mr. Clark, I respectfully disagree. I see that my time has expired. May I briefly conclude? Please. I just don't think it's realistic to expect a nurse to look through, I believe Mr. Clark's records were 400 to 500 pages, something to that extent, to do that for every inmate who presents a suicide risk. Well, we've got – was there anybody else who was at maximum risk that weekend? I don't believe that evidence is in the record, Your Honor. Okay. And we've got – I'm just looking at the district judge's opinion at pages 31 and 32, where he's basically reviewing the questions of fact that are replete in the record regarding Nurse Kuhn. And I – maybe I missed it, but I didn't hear anything that actually specifically rebutted that. Well, I guess I don't recall specifically that portion of the decision, but – Inconsistencies regarding who was responsible for placement and protection after Clark was determined to be at maximum risk. There's a contract that says not mental health, but Walker and Kuhn are pointing fingers at each other here. We've got – she knows he's got depression and alcoholism on antidepressants. She puts the results in the medical file. All meds can't remember name, no current prescription. After that, no action taken with respect to these red flags concerning mental health. No evidence she attempted to ascertain the name of the current prescription or otherwise consult with the on-call nurse or doctor so that, in effect, her failure to do so means he's off his meds. Right? Yes. And conflicts with her testimony regarding loop-tow, and then she says she started the alcohol withdrawal protocol without input or authorization from any doctor, and that was the rationale for saying he couldn't get on – he couldn't have antidepressants, and that seems to be at least hotly contested. So that doesn't sound like summary judgment material. Well, I think the focus of our argument here today is that if there's no knowledge that he is at imminent risk of suicide, then that is a prerequisite to pursue the claim. And that's not shown by maximum risk. I believe in this case it is not, Judge. You wanted to talk about a second issue with the indulgence of my colleagues. I'd just like to ask you briefly about this. Certainly. That has to do with whether Nurse Kuhn, as a private contractor, is governed by Richardson or Filarski. Of course. Are you familiar with the Sixth Circuit's decision in McCollum? I am. Do you disagree with it? Yes. And why? My understanding, at least from my review of that case, is that the court in McCollum reviewed the decision in Filarski where the Supreme Court gives some examples in history of private employees, private contractors, who were afforded immunity. And the court in McCollum says, well, we don't see health care providers there, so there's no immunity. But my reading of Filarski is that these are just examples of people in positions in history that would be accorded immunity. It sounds like then you're reading Filarski as overruling Richardson without saying so. I think I wouldn't go that far. I think it is definitely, it contradicts it to some extent. But I think that the Richardson court was very clear to emphasize that their decision applied only to private correctional guards working in a privately run, entirely privately run prison facility. So I would think that the Richardson case is limited to those circumstances. Well, why wouldn't it apply? Why wouldn't the concerns about profit motive and cutting back on a duty to provide care apply to the kinds of contracts that we see here and, frankly, throughout the circuit for all health care to be contracted out? Well, I think that you're correct. I think that they would apply. However, in Filarski, I don't know that. I agree. I think they would apply. And the implications of the argument you're making would apply to every state, the health care for every state prisoner in Indiana, Wisconsin, and Illinois at this point because they all use private contractors for health care. So, okay, thank you. Yes, thank you. Thank you, Mr. Albert. Mr. Olson. May it please the court. I'm Jeff Olson here for the estate of Ryan Clark. Defendant Keene's appeal is dead in the water after this court's en banc decision in Pettys v. Carter in 2016, where the court said, quote, qualified immunity does not apply to private medical personnel in prisons, end quote. 836 F. 3rd, 722 at 734. As to proof of knowledge, I agree with Judge Hamilton. That is an issue of fact over which this court doesn't have jurisdiction. And Judge Clavert's finding that there were at least material issues of fact in the record as to both defendants' knowledge of substantial suicide risk is beyond the jurisdiction of a qualified immunity interlocutory appeal. If it were before the court, there's plenty of evidence of knowledge. Dr. Murray Cappell talked about the importance, our expert prison psychiatrist, talked about the importance of these suicide assessment instruments. He wrote in his report the following, quote, the fact that suicide is a relatively rare occurrence makes it a challenging event to predict. This is one reason jails and other institutions responsible for the safety and care of others routinely use screening tools to identify persons who have risk factors that put them at elevated risk. Once that identification is made, the knowledge of a risk is established, and a response to this identified vulnerability to suicide must follow. Now, the defendants say they don't go along with the Spillman assessment instrument, and I suppose they might not, but we think a jury could find that they do. If a jailer has just seen an inmate's temperature taken with a thermometer and observed a reading of 104 degrees but still testifies that he doesn't think the inmate had a fever, a jury could disbelieve his testimony that he did not think the inmate had a fever. Well, that's a little more objective, don't you think, Mr. Olson, than an assessment through Spillman? It is a little more objective, but in the case of the Spillman instrument, I think a jury could still find. I'm not setting the assessment aside. I'm just suggesting the analogy may not be equaled. What the defendants knew or believed is a question of fact. In their briefs, the defendants overstate the plaintiff's burden to prove knowledge. They say that we have to prove a significant likelihood that the inmate would imminently seek to take his own life. The case from which that imminently language comes is Sandville v. McCautry, and that talks about knowledge that an inmate may imminently seek to take his own life, not would. The difference is significant, and the significance is highlighted again in this court's on-bank opinion in Petty's v. Carter. In that case, the on-bank court, and I know I'm in front of two of the dissenters, but I think we can all get along on the points for which I need the opinion. The court said, for a prison official's acts or omissions to constitute deliberate indifference, a plaintiff does not need to show that the official intended harm or believed that harm would occur. This court put that in slightly better context in its Sandville v. McCautry decision, and you're going to be interested in this, Judge Kine. The court said in Sandville v. McCautry at page 737, however, an Eighth Amendment claimant need not show that a prison official acted or failed to act, believing that harm actually would befall an inmate. It is enough that the official acted or failed to act, despite his knowledge of a substantial risk of serious harm. Whether a prison official had the requisite knowledge is a question of fact. If the circumstances suggest that the defendant official being sued had been exposed to information concerning the risk and thus must have known about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant official had knowledge of the risk. What were these individual defendants exposed to? The opinion uses the word exposed. Well, they were exposed to Ryan Clark's jail file, which contained the records from his recent incarceration nine months earlier in August of 2011 in the Winnebago County Jail, where he tried to commit suicide by cutting his wrists, not a year and a half earlier, not may have tried to commit suicide, nine months earlier in a neighboring county from which he was transferred back to Green Lake. We've discussed in our briefs many of the options. Now, Mr. Olson, that's information they could have found, right?  I mean, the adjoining county attempt, that was not evident right away to the nurse, right? It was sent along with him when he was transferred to Winnebago County in August of 2011. It was in his jail file in May of 2012, and Sandville says if the defendants had access to the information, the finder of fact could find that they had knowledge of it. That sounds pretty close to saying they should have looked at it. Right. But should have is different from what chose not to, were deliberately indifferent, didn't care. I mean, that's the kind of language you have to get to, right? Right. So what are the facts here that you think show deliberate indifference to that information? Hall v. Ryan gets to that very juncture and says if they knew about this indication of suicide risk and they didn't even do the basic things they're supposed to do, like looking at prior records, that in itself can be deliberate indifference. So it's the failure to follow up on the maximum risk assessment to do the in-depth follow-up, in essence. Is that it? Now, you would agree Sandville had some more troubling facts than we have here. Yes. Now, Walker misrepresents the record when he says that he did anything that he would not have done with any other inmate. He didn't. There's the special needs cell area and there's the booking area. They're two separate areas of the prison. He put Ryan Clark into a holding cell in the booking area. That's exactly what he did with every prisoner after intake, and every prisoner after intake was seen by the jail nurse. So he did nothing that he wouldn't have done with any other inmate. Dr. Capel wrote that an adequate response would have included referring Clark to a mental health professional. He went on to say that it would also have included placing the person under adequate monitoring or supervision, ensuring that the person was not isolated from other people and limiting access to the means to injure themselves or commit suicide. That makes it look like Keene, for example, actually engaged in what the dissent in the Petty's case called a harmful intervention when she isolated Clark in the special needs cell where he would be absolutely alone 24 hours a day, seven days a week, and where she visited him only a couple of days before she went on vacation for the long weekend. And when she visited him, she had him just stick his arm out through the food slot in his cell door to take his blood pressure and pulse. That's all the attention that he got in that special needs cell. So it's a little disingenuous to say he wasn't exhibiting strange behavior because nobody knows what he was doing in that special needs cell where he was isolated and all alone. Mr. Olson, one of the challenges, it seems to me, on your side of the case is the delay here. Walker deals with him, what, on May 23rd, right? And then Nurse Keene at least does the initial evaluation or failure to follow through around the same time, the same night. He doesn't commit suicide until May 28th. Could you address, in essence, this issue of imminence and causation? Sure. Walker, the very simplest common sense thing that Walker could have done to try to avoid a finding of deliberate indifference would be to just tell the other people involved in Ryan Clark's care that he'd scored maximum on the suicide test. If the master control aide had been given that information, he would have known to look at that video monitor in Ryan Clark's cell once in a while. Did he testify to that? Yes. He said that's why he didn't do it. Why he didn't look at the video monitor was because he didn't know about any suicide risk. Sergeant Flom, who walked by Ryan Clark's cell and looked in five minutes before the final operation that hung him and saw the rolled-up mattress, would have made something of more significance out of that rolled-up mattress had she known that there was a significant suicide risk there. So there is causation from Walker's failure to do anything. Does the medication issue figure into that? Well, the medication issue is on Keene for failing to follow up on the antidepressants and, in effect, discontinuing them. Now, here's the part of the argument that I'm the most excited about. How narrowly must a constitutional right have been defined at the time a defendant acted to defeat a claim of qualified immunity? The answer that we get from Hope v. Pelzer is narrowly enough that a reasonable officer will know when he is violating that constitutional right. In this case, the violation has been defined by this court as deliberately indifferent to a substantial suicide risk. And exactly those words, that's in Sanville v. McCautry. Here's the good part. Why don't we require that the right at issue be defined more narrowly than that? You think about something for 30 years, finally you might get an idea. Must a plaintiff show authority that he had the right to be free from deliberate indifference to his risk of suicide specifically by hanging or specifically by poisoning? No, because no reasonable officer could believe that the means by which an inmate commits suicide has any constitutional significance. No reasonable officer could believe that it is unconstitutional to be deliberately indifferent to suicide by hanging, but okay to be deliberately indifferent to suicide by poisoning. Closer to this case, must a plaintiff show case authority that he had a right to be free from deliberate indifference to his substantial suicide risk where an officer has learned of it in the same manner as in the plaintiff's own case. In this case, the Spillman assessment. No, we don't have to show that authority because where an officer has come to know of a substantial risk of suicide, no reasonable officer could believe that the manner in which he or she gained that knowledge has any constitutional significance. In other words, no reasonable officer could think that he has a duty to take reasonable action to prevent suicide where he or she has learned of a substantial risk through an inmate's self-report, but not where she or he has learned of the risk in some other equally reliable manner, such as the reports of multiple family members. And whether the officer has learned that fact, what the officer knows is a question of fact, ultimately for the jury. Thank you very much. Thank you, Mr. Olson. Mr. Boll, I think your time has expired, but you may have two minutes. Your Honors, I'd like to make two points. Number one, Officer Walker's conduct cannot be criticized. He did what he was trained to do. He put Mr. Clark in a place where he could not commit suicide, and he passed the information he had along to medical staff. The issue on qualified immunity is whether a reasonable officer in Officer Walker's position would have known beyond debate that he was violating a constitutional right. It simply cannot be said that a reasonable officer in Mr. Walker's position would have known beyond debate that he was doing anything wrong at all. His conduct is appropriate. How long was it before Nurse Kuhn found the Spillman results? Hours, Your Honor. I don't have the exact number. It's in the record, but it's very shortly thereafter. Shortly, like five hours? Something like that, Your Honor. But the plan needs to show there was significant likelihood that a person in custody would imminently take his life, right? Judge, that's my second point. Five days went by. That sets this case apart from the Seventh Circuit's other decisions, and it sets this case apart from Taylor. It is not far-fetched to say that Nurse Kuhn's assessment on the 23rd that Mr. Clark was not suicidal was absolutely accurate. Mr. Clark was put in the same special-needs cell for five days. So she put him—this is summary judgment. Another take on that is what she did was cut him off of his antidepressant medication and put him in solitary confinement. The harmful intervention. Well, Your Honor—  I represent Officer Walker, but the evidence is that Mr. Clark didn't know the antidepressant that he was on. He was also drunk. Is that unusual? Detoxification takes days, but the concept of being drunk doesn't last that long. He never said, I am on Wellbuten. Anybody ask him? I don't think so. The evidence that they did, it doesn't sound like it. Well, nobody ask Officer Walker. Thank you. Thank you, Mr. Bull. Thank you, Mr. Elmer. Thank you, Mr. Olson. The case is taken under advisement.